**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

_____

*In re* **subpoena of American Nurses Association** )
(***Gordon, et al. v. Kaleida Health, et al.*** )          **Case No. AW-11-2837**
**No. 08-CV-0378 (W.D.N.Y.))** )
                                                          )
_____)

<u>**MEMORANDUM OPINION & ORDER**</u>

Pending before the Court and ready for resolution is the American Nurses Association's ("ANA") brief in support of the Court's authority to shift discovery costs to Plaintiffs and ANA's decision to use an electronic discovery ("e-discovery") vendor (ECF No. 56).   The *Gordon* Plaintiffs filed an Opposition (ECF No. 57) and the ANA filed a Reply (ECF No. 60). No hearing is deemed necessary.  *See* Local Rule 105.6 (D. Md. 2011).

By way of background on October 3, 2011 the ANA filed a motion to quash subpoenas, motion for protective order and a request for hearing.  *See* ECF No. 1.  Plaintiffs filed a response in opposition and a cross-motion to compel.  *See* ECF No. 3.  The ANA filed a combined reply in support of its motion to quash and motion for protective order, and a response to Plaintiffs' cross-motion to compel.  *See* ECF No. 9.  On November 22, 2011 Plaintiffs filed a reply in support of their cross-motion to compel.  *See* ECF No. 10.

In support of its motion to quash subpoenas and motion for protective order, the ANA submitted the declaration of Nancy Dunton, the principal investigator for the National Database of Nursing Quality Indicators ("NDNQI") at the University of Kansas Medical Center ("KUMC").  Besides asserting the confidential nature of the information collected and the proprietary nature of NDNQI, Ms. Dunton also disclosed the burden that would be imposed on KUMC to comply with Plaintiffs' subpoena.

1

> Identifying and producing the requested information for the nineteen facilities listed [in paragraph 12] would impose an unreasonable amount of work on existing NDNQI program staff and would hamper or halt ongoing and future NDNQI operations. Although a temporary worker could assist with the process of identifying the requested information, no single person would have all of the skills needed to produce the requested information. In particular, to produce and redact the requested information would require not only a high level of clerical skills and attention to detail, but also persons with expertise in statistics; statistical programming in SAS of SPSS; ability to read contractual documents; Internet development programming such as, but not limited to the following programs, Visual Basic Studio, ASP.net, Access®, and Microsoft Reporting Services. In addition, the temporary worker would require special training in NDNQI project codes and an orientation in NDNQI terminology to navigate the NDNQI database. I estimate that it would take 40 hours of training to enable a temporary employee to assist with this process and that the cost to ANA for the temporary employee would exceed $10,000.

ECF No. 1-12 ¶ 14.

At the motions hearing on January 10, 2012 Ms. Cones, counsel for ANA, alerted the

Court and Plaintiffs' counsel to the costs associated with producing the information as requested

by Plaintiffs' subpoena if so ordered by the Court.

> We will be using an E-Discovery tool to locate information at headquarters if we are indeed ordered to produce anything. But all the results will have to be combed through. There will have to be – – because we don't make blanket designations of confidentiality – – there will have to be a review of those documents by an attorney to determine whether they are in fact confidential and to designate them as such.

> And then the materials will have to then be prepared for production. There is a cost associated with the use of the software and it's not even – – that doesn't even include the person hours, my personal man-time, that will be involved.

ECF No. 53 (Tr. 34:14-26).

After considering the arguments of counsel, the Court ruled,

> I will direct that there be compliance with the subpoena, [however] I am limiting it only to meal breaks.
>
> \*                          \*                          \*
>
> So I will go back to 2002, May of 2002, forward.
>
> The relevant area of inquiry is the subject of meal breaks, nothing else at this time.
>
> \*                          \*                          \*
>
> Once again I will also shift costs for the Discovery production to be born[e] by the Plaintiffs.

*Id.* (Tr. 56:12-14, 22-25, 57:8-9).

The Court ordered the ANA to produce the information and data within forty-five (45) days. *See id.* at 72:7-20. The Court memorialized its rulings in the Order of January 13, 2012 whereby Plaintiffs' motion to compel was granted in part and denied in part, the ANA's motion to quash was denied and the ANA's motion for protective order was granted. *See* ECF No. 14.

Thereafter, the ANA moved accordingly to comply with the Court ordered deadline of 45 days or by February 25, 2012. The ANA selected BIA Total Discovery ("BIA") as the e-discovery vendor to ensure a forensically sound, electronically stored information ("ESI") discovery process. BIA prepared a Scope of Work dated January 30, 2012. *See* ECF No. 17 at 6-11. BIA estimated the total one-time costs as *$241,667.00* and the total monthly recurring costs as *$11,940.50* (for an expected duration of two months). *Id.* at 11. On February 1, 2012 Ms. Cones, counsel for ANA, sent an e-mail to counsel for Plaintiffs, stating in pertinent part,

> With respect to Gordon and Hinterberger, we are currently filtering data that has been collected through our e-discovery process. To expedite matters, mitigate costs, and increase search productivity, please provide me with a list of key words consistent with the scope of discovery set forth in the protective orders that will enable us to identify and, if appropriate, produce the information pursuant to the court's orders. Please include in your list the identities and

addresses of each health care facility that is a defendant in the case about which you seek discovery from ANA. Please also include the names of all named and opt-in plaintiffs, as well as key words from topics about which you intend to seek testimony from an ANA representative, to the extent that information is presently known. Please provide this information in the next 48 hours. This is a time sensitive matter, and delay in providing this information may delay production, so I appreciate your prompt response. Barring delay, we anticipate that we will be able to produce on or before February 25th.

Finally, attached is the Scope of Work from ANA's e-discovery vendor outlining the work that must be done to comply with your subpoenas, along with an estimate of costs, which will be billed to you directly in accordance with the court's orders. Please note that, if the number of matters in which ANA is required to provide information declines, the cost for review will be reduced proportionally by about 12 cents per document. Please sign the agreement as the plaintiffs' representative to acknowledge your obligation to pay and then return it to me electronically so that the vendor will be able to proceed. Again, a delay in receiving your signature may delay production. Please also put a hard copy of the signed agreement in the mail to me, so that I can forward same to the vendor. **Please note that the cost reflected on the estimated scope of work does not represent the total costs of complying with your subpoenas. ANA's internal costs and the costs incurred by NDNQI program staff at Kansas University[1] are not included.**

*Id.* at 4 (E-mail from Cones, Esq. to Cordello, Esq., et al. of 2/1/12).

After a preliminary exchange of e-mails between Plaintiffs' counsel and ANA's counsel on February 2, 2012, *see id.* at 13-14, Plaintiffs' counsel sent the following e-mail to ANA's counsel,

As we've considered these issues further, before we have an ESI call, some preliminary information would assist the ANA and us in assessing the production issues. In particular, please let us know how the following information is stored: (1) the survey questions; (2) survey responses from participants; and (3) any reports provided to the hospitals or hospital system. Would you be in a position to let us know the answer this afternoon at the time

---

[1] Previously identified as University of Kansas Medical Center or KUMC.

currently scheduled for the call?  If so, we can discuss it then — if not then we can schedule a time next week.

In the meantime, given that there will be no ESI call today, we'll let the others know.

We also want to be clear that because we bear the cost for production, we will only be responsible for costs we approve in advance.  Therefore, before any cost is expended, please obtain our approval in advance.

*Id.* at 12 (E-mail from Cordello, Esq. to Cones, Esq. of 2/3/12).

Less than one hour later Ms. Cones sent the following e-mail response,

Costs have been incurred to move this process forward as required by the court's order to produce within 45 days of the rulings on the pending motions.  ANA expects you to bear the burden of those costs, as ordered by the court.  I stated at the hearing that we would be hiring temporary help at ANA and the affidavits submitted by ANA in these cases are clear that additional help would need to be hired by KU,[2] as well.  I also stated at the hearing that we would be using data collection software and vendors, that we would have to purchase hardware and software, that there would be astronomical man hour costs involved, etc.  We have moved forward with the process to meet the court's orders in good faith.  The court did not require us to seek your approval in advance of proceeding with discovery.  You can rest assured that we have done our best to contain the costs and that all costs that have been incurred have been both reasonable and necessary.

ANA was not ordered to produce or answer questions about the NDNQI data base design, which is highly proprietary.  You have refused to provide me with Agreements to Be Bound by the Protective Orders signed by anyone in your office or any of the vendors/contractors that you use and who may come into contact with ANA's highly sensitive and proprietary data.  We will not, under these circumstances, share with you confidential data about where and how such information is stored, which includes proprietary source code.  It is not necessary for ANA to reveal that to you in order to comply with the information you requested in your subpoenas and that the court has ordered ANA to provide in response to your motions to compel.  ANA will collect the materials that it is required to provide using the vendors and

---

[2]  Kansas University.

methods that are acceptable to ANA.  If you have a problem with that, we will approach the court.

In light of this discussion, I will immediately halt further work to produce this information until I hear back from you.

*Id.* (E-mail from Cones, Esq. to Cordello, Esq. of 2/3/12).

Plaintiffs' counsel apparently did not respond and ANA submitted a status report on February 8, 2012.  In the final two paragraphs of the status report, Ms. Cones wrote,

ANA maintains that data collection by Plaintiffs' counsel and/or contractors would not be appropriate in this case.  It is no more appropriate for Plaintiffs to have unlimited access to ANA's electronic files and data than it is for Plaintiffs to have unfettered access to the paper documents in file drawers in ANA's headquarters or at the NDNQI research facility at KU.  The process of identifying and locating electronically stored information relating to meal breaks, which ANA has been ordered to produce, inevitably entails collection and review of potentially vast amounts of information, some of which is confidential and/or proprietary, that ANA has not been ordered to produce.  ANA has the right to protect against disclosure of such information by performing its own data collection and review, and utilizing its own e-discovery vendor.

It is ANA's position that Plaintiffs[] have an obligation to pay for the costs of discovery per the Court's Orders and that they must approve the vendor contract.  Therefore, ANA will not resume the processes required to respond to Plaintiffs' subpoenas until Plaintiffs' counsel signs the vendor agreement, approves ANA's proposed Stipulated ESI Protocols or a mutually satisfactory version of same, and agrees to pay the costs and fees incurred in good faith by ANA as a result of activity conducted to date in effort to comply with the court's verbal order to produce the court-ordered discovery by February 25th.  As a result, it is unlikely ANA will be able to meet the Court's forty five (45) day deadline.

*Id.* at 3.

Plaintiffs' counsel responded in the status report of February 24, 2012 asserting,

The primary issue preventing the parties from resolving the outstanding issues regarding ANA's compliance with this Court's

6

Orders dated January 13, 2012 (the "Production Orders") is ANA's steadfast and continuing refusal to engage in meaningful, good faith conferral with plaintiffs. Instead, in response to the Production Orders, which directed ANA to produce subpoenaed information regarding meal breaks, ANA demanded that plaintiffs agree to a cost estimate of approximately a quarter of a million dollars—which, ANA is quick to note, does not include all relevant costs—before ANA would produce anything at all. Yet ANA has refused to respond to plaintiffs' reasonable requests for additional information that would allow the parties to work cooperatively to determine whether another, more cost-effective approach would permit the resolution of these cases.

Simply put, ANA is not interested in conferral or in a cost-effective resolution, but is attempting to effectively avoid its obligations under the Production Orders by making it prohibitively expensive for plaintiffs to obtain the information to which this Court has determined they are entitled.

ECF No. 19 at 1-2.

In response to this dispute the Court initiated a telephone conference on February 28, 2012. Ms. Cones explained the position of the ANA.

In accordance with the rules – – the federal rules governing electronic discovery, ANA has secured and submitted to the Court and to counsel for the plaintiffs in early February an e-discovery protocol which satisfies all of the e-discovery protocol requirements that are suggested in this Court['s] local rules.

And you know, the costs associated with e-discovery is high. E-discovery from a database as large as NDNQI is not something that ANA is capable of doing in house. And therefore, in order to comply with the requirements of e-discovery in a forensically sound manner and to comply with the Court's orders to produce information, ANA engaged a third party e-discovery vendor that has a fabulous reputation that has reasonable costs and that was proven to provide services, e-discovery services in a forensically sound manner.

Because plaintiff's counsel has been ordered to pay for the cost associated with discovering this information, we submitted the e-discovery vendor's scope of work and contract to plaintiff's counsel for their review and signature. We have not received to date any of the information we need in order to continue with the

e-discovery process.  We have not received a signed contract back from plaintiff's counsel so that we can continue to work using the e-discovery vendor.

ECF No. 62 (Tr. 5:8 – 6:5).

Ms. Cones further explained why the cost of complying with the Court's order is high.

There is a terabyte of information in the NDNQI database. If plaintiff's counsel wants electronically stored information regarding the meal breaks, the RN surveys, the background information which we have been ordered to produce, that information has to be scanned. Then it has to be – – it has to be c[u]lled and the document has to be reviewed.  To weed out the information that pertains to the 1,800 hospitals that aren't named defendants in any of these three cases.  To weed out protected patient information.  To weed out confidential trade secrets and the so-called general clawback provision does not protect ANA from suits against folks whose HIPAA protected information is wrongfully disclosed even accidentally.

*Id.* (Tr. 8:17 - 9:4).

Mr. Cordello expressed the position of the Plaintiffs.

We were obviously surprised at the cost and asked the ANA if some of the data that we were interested in and you had ordered to be produced were available – – was available in a paper format.  The ANA confirmed that in fact, yes, some of this data was available in a paper format.  At that point, we thought it would make sense to reschedule the meet and confer to assess whether or not electronic discovery was even necessary given that much of the information we are seeking was in a paper format.

And just to be clear, the data we are seeking is all structured data.  And by structured data, what I mean is data housed in a database.  NDNQI, National Database of Nursing Quality Indicators.  Structured data is very accessible because all that needs to happen is a query through the database.  This is not a tradition[al] e-discovery case where we would be seeking e-mails, files, things of that nature.  Where they would have to search with key terms across their entire data map of information.

This is a very straightforward simple e-discovery case.  The ANA has turned this case into an opportunity to drive up the costs unnecessarily.  We think it would save this Court a lot of time if

we could have our vendors discussed the way to access this structured data through a simple query.  We are looking for three very specific items of data.

We are looking for the NDNQI survey report.  Judge, I have seen these reports, they have been produced in other litigation.  These are not complicated reports to produce.  The second piece of information we are looking for is the actual survey question.  The problem we don't know what questions – – the survey participants are being asked.  Again, this information would be easily accessible through a basic data base query.

The final piece of information is the responses to the survey.  Obviously as you had previously ordered, these would need to be anonymous and they are anonymous as the NDNQI and the ANA have confirmed in their previous filings with the Court.  So, what needs to happen from our perspective, Your Honor, is that the e-discovery vendor meet and confer with counsel present and come up with a cost effective way to access this structured data.

*Id.* (Tr. 11:7 - 12:21).

Ms. Cones addressed the Plaintiffs' apparent revised scope of discovery.

Your Honor, with respect to the first issue, that being particularly the scope of discovery, this is the first time that we have understood that plaintiff's counsel is now seeking only paper copies of the NDNQI data reports, the three survey questions and the survey responses.  Here to – – – we have had many discussions, hours worth of discussions before this Court where we have argued over whether we need to turn over information regarding the survey science, the bench mark, materials regarding courses that have been had, discussing this – – – survey, marketing materials, e-mails.

In fact, they request all of that information pertaining to meal break[s], I will give you that, pertaining to meal breaks.  And if they no longer need that information, that is fine.  That will narrow the scope of what we work – – what we need to produce if they are willing not to collect that information.

Of course, the cost estimate that is set forth in the scope of work by the e-discovery vendor assumes that we will only be producing the information relative to the hospital for the

defendants in these three case[s][3] and the information that is related to meal breaks for those hospitals.

We did not exclude – – or we did not assume in preparing the costs estimate that we would not have to produce the survey – – – information or background information relating to the meal break question or that we would not have to produce information regarding courses and seminars that might pertain to meal breaks. Or bench marks that might pertain to meal breaks.

That is all stuff that plaintiff has been fighting for for the past two years. If they don't want it now, that is fine. If they have done some sort of analysis to determine that that is no longer a cost effective thing that they need, you know, then that is absolutely fine we don't have to do that if there is pre-portionality analysis indicates that it is no longer required. We just won't give it to them and we can do an estimated – – another revised estimated cost estimate there.

*Id.* (Tr. 14:10 - 15:21).

After listening to the positions of the parties, the Court noted,

So I am not going to make any rulings with reference to the cost estimates but what I am going to do is encourage you to meet and confer with counsel and now we have I guess, counsel for two of the hospitals now along with the [e-]discovery people and see if there is a way to either do this only on paper or maybe there is a way to handle the information in a more limited way.

I do understand ANA's need to always do a privilege review, a HIPPA review. It is obligated that they are intending to do, so they – – the smaller amount of universe of documents they have to review, I think the less costs we are going to have.

*Id.* (Tr. 19:1-12).

Mr. Cordello raised concerns about attorney's fees sought by the ANA.

[MR. CORDELLO]: . . . I think one issue that we are going to see here is ANA wants plaintiffs to pay for the cost – – well we deem them to be attorney's fees for the document review.

MS. CONES:  Well – –

---

[3] In addition to the *Gordon* and *Hinterberger* cases, Ms. Cones is alluding to the *Kuznyetsov v. West Penn Allegheny Healthy System*, AW-11-CV-408.

THE COURT:  ANA is not a party to this law suit.  They are a third party.  They are sitting in Silver Spring, Maryland.  They don't even want to give you this information and I, using the authority of the federal court, have told them to go into what they consider highly proprietary, highly sensitive information and give it to you and before they give it up – – I mean, it is not unreasonable for them to make that review.  So why should they bear the cost of that?

MR. CORDELLO:  Well, Your Honor, respectfully we would assert that there is case law out there, that those aren't considered costs but those are considered fees.  And given the protective order in place, that there really isn't the need for the type of review that they are suggesting.  For instance, in the latest estimate from BIA this morning, a half million dollars of the estimate is for document review.

That is – – that is going to be the major component of the costs and we don't believe their costs.

THE COURT:  Well, I thought when I was ordering this that what we need have are two hospitals.  We have the responses from two hospitals about a very small number of questions.  So you – – you know – –

MR. CORDELLO:  That is what we thought too, Your Honor.

THE COURT:  What we need to do is limit the universe of information that has to be reviewed and it is – – we are going to have to work with our vendors to be able to drill down and to pull out very discrete data so that we are not spending a lot of money on review.

MR. CORDELLO:  I agree, Your Honor.

*Id.* (Tr. 21:3 - 22:11).  At the conclusion of the February 28, 2012 telephone conference the Court recognized there would be a delay in ANA producing the requested information.

The counsel for the parties and their respective e-discovery vendors had a meet and confer on March 7, 2012.  The following day, counsel for Plaintiffs and ANA filed status reports.

*See* ECF Nos. 22-23.  On behalf of ANA, Ms. Cones summarized the parties' efforts and the

scope of work to be performed.

> During the meet and confer, Plaintiffs' counsel identified the following three categories of electronic information that plaintiffs now seek to obtain from ANA:  (1) structured data (survey questions, individual survey responses and survey reports); (2) a "complete statement" of the survey methodology/survey science; and (3) all communications with or related to Defendant hospitals, including emails,[4] marketing materials and all other communications.  According to Plaintiffs' counsel, although this third category is less likely to contain information relevant to plaintiffs' claims, plaintiffs want to collect it anyway, because it "could be interesting."

> Pursuant to the Court's Order dated January 13, 2012, ANA was fully prepared to collect, review, and produce the information identified above by the original February 25, 2012 deadline.  However, during the February 28, 2012 telephone status conference with the Court, Plaintiffs' counsel accused ANA of attempting to drive up costs by collecting information that plaintiffs do not want.  Specifically, during that February 28th status conference, Plaintiffs' counsel represented to this Court, in no uncertain terms, that Plaintiffs only want ANA to produce the structured data identified above.  On March 1st, in reliance on this representation by Plaintiffs' counsel, ANA's e-discovery vendor, BIA, revised its Scope of Work and Estimated Cost overview (collectively "Third Revised SOW").  Copies of the March 1st Scope of Work and Estimated Cost Overview are attached hereto. . . .

> In light of the drastic change in position articulated by Plaintiffs' counsel during yesterday's meet and confer, the second such change of position in a week, ANA and its e-discovery vendor are again revising the Scope of Work and Estimated Cost Overview (collectively "Fourth Revised SOW") to reflect the broader scope of information identified above that plaintiffs[] now seek to obtain from ANA.  ANA hopes to have the Fourth Revised SOW sometime early next week.  ANA further hopes that the Scope of Work and Estimated Cost Overview will not require

---

[4] This is <u>directly contrary</u> to the representation of Plaintiffs' counsel during the February 28, 2012 telephone conference.  "*This is not a tradition[al] e-discovery case where we would be seeking e-mails, files, things of that nature.  Where they would have to search with key terms across their entire data map of information.*"  ECF No. 62 (Tr. 11:20-24) (emphasis added).

further revision and that the scope of information that ANA is asked to produce does not continue to be a moving target.

The Fourth Revised SOW will be based on the following discovery plan, to which Plaintiffs' counsel agreed during yesterday's meet and confer[.]

ECF No. 23 at 1-2 (citations omitted).

For the record, the estimated cost overview for the Third SOW was *$52,000.00* with a one-time recurring charge of *$4,650.00*.  *See id.* at 14.  These numbers are a significant reduction from the original scope of work and estimated cost overview.  *See* ECF No. 17 at 11.

A telephone discovery status conference was held March 8, 2012.  The Court scheduled a follow-up status conference call on March 28, 2012.  *See* ECF No. 24.

On March 23, 2012 ANA filed a status report.  Ms. Cones disclosed the following:

2.   **Second Meet and Confer**

On March 15, 2012, ANA's counsel and Plaintiffs' counsel participated in a second meet and confer conference call ("Second Meet and Confer"), with each party's e-discovery vendor.  Counsel for the defendants in the above-referenced cases were also present.

During the Second Meet and Confer, Plaintiffs' counsel yet again changed the scope of electronic information that they seek to discover from ANA.  Specifically, Plaintiffs now seek to obtain the following:   (1) the complete (i.e., unredacted) RN Survey instrument;  (2) the RN survey response rate calculations (presumably limited to meal break questions); (3) for each of the twelve health care facilities identified on the attached list, a "domain name" search of the NDNQI database and the electronic information system files of each of the three KU custodians and each of the three ANA custodians identified in Exhibit 1; and (4) an opinion from another e-discovery vendor regarding the reasonableness of the Estimated Cost Overview submitted by BIA Total Discovery.

\*                          \*                          \*

5.   **Domain Name Searches**

At the first meet and confer on March 7, 2012, counsel for ANA and Plaintiffs agreed to work together to create a list of "key terms." On March 13, 2012, ANA produced its key terms list to Plaintiffs' counsel. However, during the Second Meet and Confer on March 15, 2012, Plaintiffs' counsel rejected ANA's "key terms" list. Instead, Plaintiffs' counsel demanded that ANA conduct a "domain name" search to locate the entire universe of information that pertains to the twelve health care facilities listed on Exhibit 2. Plaintiffs' counsel also stated that Plaintiffs would not provide a key word list, which Plaintiffs regard as unnecessary if a domain name search will be performed. ANA informed Plaintiffs' counsel that ANA does not object to performing a domain name search that is limited to the appropriate time frame (i.e., 2002 to the present). However, a domain name search will collect information that exceeds the scope of what ANA has been ordered to provide. Therefore, the results of a domain name search will have to be filtered using key words to identify only that information that is related to meal breaks. Accordingly, counsel for ANA renewed its request for Plaintiffs' key word list.

It is important to note that a domain name search will be more expensive than a simple collection from the key custodians, because it will require searching not only the key custodians' information systems but the entire NDNQI data map, or those parts of the data map may contain information relevant to the Defendant hospitals. Furthermore, because an unfiltered domain name search will collect information that is unrelated to meal breaks, the fees and costs for reviewing the search results will increase.

ECF No. 27 at 1, 2-3 (citations omitted).

In this same status report Ms. Cones disclosed that ANA made its first production to Plaintiffs' counsel. That first production consisted of (a) NDNQI Structured Instruments used from 2006 to the present and (b) a list of three custodians from ANA and three custodians from KU who most likely are in possession of responsive communications with the Defendant hospitals about meal breaks. *See id.* at 6-7 (Letter from Cones, Esq. to Cordello, Esq. of 3/13/12 at 1-2).

In the Plaintiffs' status report of March 28, 2012 Mr. Cordello identified areas of disagreement, issues with the cost of ANA's e-discovery vendor and the benefits of a domain name search.

> Currently, the parties appear to be in disagreement over the following four issues:
>
> > 1.      Should the parties secure a competing quote on this discovery project from an independent e-discovery vendor?
> >
> > 2.      Does the ANA's e-discovery vendor's proposal include unreasonable and unnecessary costs?
> >
> > 3.      Should the parties use a domain filter as opposed to search terms to locate documents and communications in ANA's or NDNQI's possession that relate to Kaleida or Catholic?
> >
> > 4.      Should the ANA produce the actual survey instrument and NDNQI survey response rate calculations because such information is relevant to validate the survey results?
>
> *                              *                              *
>
> ***ANA's E-Discovery Vendor's Unnecessary and Unreasonable Costs***
>
> Plaintiffs are concerned that ANA's e-discovery vendor is overcharging for their services.  The following are some examples of plaintiffs' concerns with ANA's e-discovery vendor's pricing:
>
> - ANA's e-discovery vendor has proposed nearly 60 hours of professional services.
>
> - In addition, ANA's e-discovery vendor has also proposed a recurring charge of 25 hours of monthly professional services.
>
> - ANA's e-discovery vendor is also charging rates on average of $250 [per] hour (some as high [as] $450 [per] hour).
>
> - ANA's e-discovery vendor has proposed over $6,000 for a privilege review that is not necessary.  No such review is necessary because the discovery at issue in this case is not protected by any privilege.  In particular, the structured data in the NDNQI database

is not a communication covered by attorney client privilege nor is it HIPAA protected. Similarly, any communications between the ANA and Kaleida or Catholic would not be privileged.

Both the number of hours and rates per hour that ANA's e-discovery vendor is charging are far outside what is typical for this type of project. Given these examples of unnecessary and unreasonable costs, in addition to the reasons stated above, plaintiffs believe it is appropriate to have at least one independent e-discovery vendor, if not more, propose a competitive bid for this project.

### Domain Name Filter Search of Six Custodians

Plaintiffs have proposed using domain names as the most cost effective and efficient means of conducting discovery in this matter as it pertains to communications in ANA's or NDNQI's possession that relate to Kaleida or Catholic, including those that were sent to or received from Kaleida or Catholic (including the hospitals and health centers that comprise both Kaleida and Catholic). Using a domain name filter instead of search terms, will likely identify communications most relevant to the subpoena. For example, communications between the ANA and NDNQI and Kaleida and Catholic Health that relate to the administration, marketing and results of the surveys will likely be identified using a domain name filter search. Moreover, eliminating key word searches will reduce costs by avoiding false positives and false negatives commonly associated with search terms. Further, domain name filter searches will eliminate the need for any privilege review as any attorney client privilege will have been waived by virtue of the communications being outside the scope of the privilege.

ECF No. 29 at 2, 3-4 (citations omitted).

The Court initiated a telephone conference on March 28, 2012. The Court noted during the preliminary portion of the telephone conference the issue of costs associated with the ordered production.

Well, I think what [Ms. Cones] is saying is that, in the order of January 13th, there is paragraph 7 is very short. Which is that the cost for this discovery for this discovery action will be born[e] by plaintiffs.

Now what does this mean?  I mean, at the time that I entered this, my normal view is that in a corporation it gets a request for a discovery that a certain amount of time will be donated by the corporation.  Maybe a day or two of their counsel's time and maybe two or three days of search time for their administration staff.

But after that, I began to shift costs.  And it appeared that the cost might be significant, we didn't know because we didn't know how to go about doing this.  Since that time, what has happened is that ANA has gone out and gotten a vendor because they feel that the vendor is better able to do this than their own staff and – – – the vendor's capabilities and obviously the cost of this has gotten to be significant.

Mr. Cordello has come in and [in] essence alleged that gee whiz, these costs are unreasonable.  Work is being done which does not have to be done and I am certain that the folks the e-[discovery] vendor for ANA which is BIA will you know, be able to defend their work.  And Ms. Courtney will be able to defend her opinion as to whether it is reasonable or not.

ECF No. 31 (Tr. 14:13 - 15:10).

Mr. Cordello expressed his views about the superiority of a domain name search versus a

key word search.

Thank you, Your Honor.  Believe it or not, we suggested the domain name search as opposed to search terms because we thought and still think that it will be a more cost effective and relevant way to identify the information that [is] most relevant to the claims in the underlying cases.

It has been my experience with search terms is that they can lead to many false positives and false negatives and we are trying to avoid situation as much as possible.  Given your order, we are to bear the discovery costs in this case.  We have a vested interest in proceeding in the most cost effective manner as possible.

And we believe that domain filter, Catholic and Kaleida's e-mails domain to capture communications to and from ANA and Catholic and Kaleida to the – – – facility that we have agreed upon, will produce much more discrete and relevant information than it doing a key word search.

17

*Id.* (Tr. 13:1-16).

        Not surprisingly, Ms. Cones on behalf of ANA disagreed.

> It is incumbent that I point out to the Court that ANA provided its proposed – – – protocol to plaintiffs, the first week in February. They still have not responded to it. ANA was operating under a court imposed deadline of February 25, 2012 to produce the information that plaintiffs requested in their subpoena. And in [an] effort to do everything possible to comply with this Court's order and hearing nothing from Mr. Cordello to either the proposal submitted from BIA or ANA's proposed e-discovery protocol, we went forward to do what was our court ordered obligation to do.

> And that is to begin the process of collecting the information with the thought of turning it over by the February 25th deadline. On [the] one hand, Your Honor, the plaintiffs want this information but they have held ANA at bay by refusing to provide any of the things that we needed in order to move forward in the manner that Ms. Courtney suggests when we requested it back in early February.

> With respect to the domain name search and the key word search, ANA is happy to do a pure domain name search with the understanding that because it is going to produce the entire universe of information relative to the hospital's directory under the domain name, we are going to have to conduct a review of more documents to make sure that we are not turning over any information that we are not required to turn over because the Court has limited the scope of discovery to meal breaks.

> Now we have proposed as a cost saving measure that we will do the domain name search and then filter those results using the key word so that we produce only documents that are relevant to the limited scope of discovery that has been ordered in this case, thereby re[ducing] the amount of time that humans have to lay eyes on these documents to make sure that we are not turning anything over that we are not supposed to.

*Id.* (Tr. 18:8 - 19:15).

        Toward the conclusion of the telephone conference the Court deferred ruling on a couple

of issues.

> I – – I don't know if we need really to go on and address [domain name search versus domain name plus key word search] until we get [the designation of the e-discovery vendor] settled. And I think what we may very well have to do is just hold all future action in advance. I certainly don't want BIA to be running costs or Ms. Courtney to be running costs until we actually decide what it is.
>
> Because sooner or later, you know, Mr. Cordello may have to look at what I have decided and decide whether or not he wants to pay for it and obviously there is going to be decisions by both attorneys. Before we go much further and incur much more expense, I think we ought to know where we are going.

*Id.* (Tr. 25:25 - 26:11). The Court issued an Order that same date permitting "Plaintiffs to inquire during a future Rule 30(b)(6) deposition of an ANA designee, within the parameters of meal breaks only, about topics addressing the validity of the NDNQI results, specifically, the actual survey instrument and survey response rate calculations." ECF No. 30. All other matters were held in abeyance.

A few weeks later the parties filed additional status reports. *See* ECF Nos. 32-33, 35. On May 9, 2012 the Court initiated a fourth telephone conference. The first issue the Court addressed was the following matter raised in Plaintiffs' April 27, 2012 status report.

### 1. NDNQI Reports

> With respect to the NDNQI reports, the ANA insists they must engage an e-discovery vendor and spend tens of thousands of dollars to conduct a massive search to obtain and produce these reports. The ANA has refused to explore more cost effective options of producing the NDNQI reports.
>
> It is plaintiffs['] understanding that the NDNQI reports exist in a paper format and that an e-discovery vendor is not necessary. The reason plaintiffs believe this is to be true is that plaintiffs' counsel is in possession of numerous NDNQI reports that were produced in a paper format in other lawsuits. Common sense dictates that the NDNQI reports for Catholic and Kaleida would also exist in a paper format given that they have been produced in a paper format in other cases.

Further, it would make little sense that any time one of the hundreds of hospitals that pay the ANA for their NDNQI survey requested a report from a previous year they would be billed tens of thousands of dollars from an electronic storage vendor in order to meet that request. Consequently, plaintiffs believe the ANA can quickly re-produce the reports for Catholic or Kaleida at virtually no cost. To comply with this Court's limitation that discovery be related to meal breaks, the ANA would simply need to redact (or not produce) the pages of the NDNQI report that do not pertain to meal breaks.

ECF No. 33 at 1-2.

Ms. Cones responded to these assertions during the May 9, 2012 telephone conference.

[MS. CONES]:  We do not maintain them that way here at ANA, so perhaps it is a cost saving measure, which we are always suggesting cost saving measures notwithstanding point of counsel's statement to the contrary, maybe they should look to get them through the other sources as we suggested originally but I can assure the Court NDNQI is an electronic database, paper reports do not exist with us.

THE COURT:  Can you produce paper reports?  I think that was one of their arguments if you could actually produce them themselves.

MS. CONES:  If they can tell us what they want we could produce it on paper rather than producing it electronically, but it doesn't obviate the need for us to search for them through the electronic database.

Now that having been said, it is possible to do a simple search to get the report and to print only that information related to meal breaks that is relatively simple, that is not where the cost is involved.  The cost is involved in what they address in paragraph 2 starting on page 2 of their April 27th status report and that is these communications.

They have asked for all communications under the sun and in order to do that we have got to search for them, we have to got to find them and notwithstanding there are limits to the contrary we have a protective order in place that gives us the right to review them, to make designations of confidentiality, to assure that we are not turning over anything that is privileged.

> By the way, there may be privileged information that doesn't pertain to RN surveys.  They have asked for a hearing on everything under the sun.  The RN survey is a very, very small part of what NDNQI Research Program does.

ECF No. 61 (Tr. 6:18 - 7:25).

In the following exchange between Mr. Cordello and the Court, topics include Plaintiffs' efforts to obtain documents from other sources and the scope of the electronic communications sought by Plaintiffs.

> THE COURT:  Earlier on in the discussion Ms. Cones I think said that you could have gone to the Defendant health organizations both Catholic and Kaleida I thought and ask them to run the reports that they have access to and turn them over to you thus they [saving] us all of this effort.  How come that was not done?

> MR. CORDELLO:  That was done, Your Honor, however those Defendants have still yet to fully respond or respond at all to those requests and the concern was they might give up some of the reports, not all the reports and that by going through the ANA, the entity, the trade organization that actually creates reports, we would be satisfied knowing that we got all the relevant reports.

> THE COURT:  Is there a Motion to Compel pending in the Western District of New York to get full compliance by both Catholic and Kaleida?

> MR. CORDELLO:  Not on that particular issue with the NDNQI reports.   The parties are still in the process of meeting and conferring Your Honor and there has been some progress but to date the reports have not been produced and pending the outcome here it might be coming more quickly.

> THE COURT:  But you are saying – –

> MR. CORDELLO:  We heard that Ms. Cones can simply produce these reports at little or no cost and we know we are going to get all the relevant reports that confirms Plaintiff's strategy that this was the best way to go.

THE COURT:  All right, I am certain Ms. Cones will be able to respond to that but why don't we talk more about what you wish to say.

MR. CORDELLO:  Finally, Your Honor, there is this issue of the communications.  We heard Ms. Cones say repeatedly that we are asking for all communications under the sun, well that is just simply not true.

The parties have made some progress to date, meeting and conferring and reducing the number of custodians who have likely had relevant communications and documents to six custodians.  So I don't see how six custodians is all communications under the sun.

On top of that, Your Honor, we had your very clear order that limited the discovery to meal breaks.

THE COURT:  Don't they initially though have to search for all communications for the two Defendant corporations and then doesn't that then get into the issue of we are going to do key searching or not and by doing key searching we can narrow down the universe of documents that actual eyes have to be laid upon for the privileged review?

MR. CORDELLO:  I don't think it does, Your Honor, I think what the Plaintiffs have proposed here is a much more cost effective way to getting the discovery that complies with the subpoena.  We have six custodians, three from the ANA, three from NDNQI, the thought was we would do a domain search, domain meaning for electronic communications we would have Kaleida and Catholic domain name at Kaleida.org or CatholicHealthSystems.org, the domain name of a website.

\*                                    \*                                    \*

Therefore, there would be no need to do a hands on eye review of all the documents or the electronic communications – –

THE COURT:  No, you are only entitled to communications dealing with meal breaks not all of the other issues in the survey.

MR. CORDELLO:  Correct.

THE COURT:  And what you said was that we are going to get, first of all you are going to get all the electronic communications between ANA and the two hospital systems.  You are assuming it

only relates to the survey but it could relate to any number of other things and then what you are entitled to from the survey is not 50 or 100 questions, it is only I think two questions or three questions, so what you are going to get is much more narrow.

*Id.* (Tr. 15:1 - 17:4, 10-24).

Ms. Cones responded to the assertions made by Plaintiffs' counsel.

First of all, Plaintiff's counsel claims that they have had no voice in the work that has been done by BIA to date and has no voice in selecting the key word and has had no voice in the process that has taken place today.

Well, Your Honor starting in January almost immediately after this Court issued its order compelling this limited production, I started sending emails to Plaintiff's counsel to which they have not yet responded asking them for their input on the prospect and the key word terms. They have refused and fail to provide any of that information and now want to make a scene like they have been the injured victims here because they have not had any input into the process.

I reject that argument and I suggest that the Court should reject it as well. Plaintiffs brought that on themselves. In addition Your Honor, using BIA first of all, ANA has never used BIA until it got these subpoenas issued by Plaintiff's counsel in these [cases] Gordon, Hinterberger, – – – and – – – which the Court has been treating in its hearing and in its status conferences just like today as one single group of subpoenas for time saving and efficiency measures.

ANA engaged BIA in February facing a February 25th Court ordered production deadline after having no input from Plaintiff's counsel, we have never engaged them before, we have a single contract with them, it has been produced for the Court, it has been produced to Plaintiff's counsel, we have asked Plaintiff's counsel to sign onto it, they have failed and refused to do so for now nearly five months.

There is no conflict with BIA, none, none whatsoever. This is the first time ANA has ever used them, they are completely independent and I will allow them to address that themselves momentarily.

In addition, we never said that we could produce the report at little or no cost.  Even though we can produce them through a simple search there is going to be cost involved and even if we do that we cannot know that we will get all the other reports which by the way seems like just a way to check on the Defendants to make sure that they produce what Plaintiffs requested.

We don't know what the Defendants ordered, they ordered their own reports.  So unless the Defendants tell us what reports they ordered and how they ordered the data to be sliced we don't necessarily know that, okay, if the Plaintiffs want us to figure that out that involves additional work, additional e-discovery, additional searching, additional man time, we might be able to figure it out but that is going to increase the cost.

Rather they could go to Defendants and get theirs like we said months ago when they issued, years ago, when they issued the subpoenas they have chosen not to do that.  Instead, they have elected to file a Motion to Compel a non-party, put us through all this cost and expense, they have not moved to compel the Defendants, I ask Your Honor why?

*Id.* (Tr. 20:1 - 22:3).

Mr. Cordello discussed further the issue of obtaining reports from the Defendant hospitals.

MR. CORDELLO:  Thank you, Your Honor, just briefly just to clarify cases that – – – and the idea of getting the reports from Kaleida and Catholic makes sense but only to a certain extent.

It still would have made sense to serve the subpoena on the ANA and the NDNQI because we couldn't properly authenticate the reports without that information in particular the questions that are asked, we would never get that information from the Defendants as well as a statement of survey methodology which doesn't exist but we hope to establish through deposition.

So if we are able to get the reports directly from the Defendants that doesn't necessarily answer all the questions or make the serving of the subpoena moot.  The second issue that we have is the e-discovery vendor I still have not heard a justification from the ANA as to why if the NDNQI reports can be retrieved through a simple search that we need to enlist an e-discovery

vendor to conduct the simple search.  So those are the two things I wanted to try to figure out and clarify – –

THE COURT:  Why don't we let Ms. Cones answer that question first.

\*                                    \*                                    \*

MS. CONES:  Yes, Your Honor, we engaged [an] e-discovery vendor[] because they asked for more, they didn't ask for just reports they have asked for this other stuff and as I told the Court in our previous status conferences and as I stated in the pleadings and status reports that we have filed, this is a non-profit organization, a very small office, all of this stuff will have to be reviewed and redacted for we do not have the manpower or the resources to do that.

I[f] it [is] done by ANA's NDNQI's vendor at KU we will incur additional costs anyway because the time for, the vendor's time is billed to ANA.  So either way whether BIA gets it or whether KU gets it there is going to be an additional cost and it seemed to me as a cost saving measure to make sense to have the e-discovery vendor get both the report and these other communications that Plaintiff's counsel has requested.

In addition, with respect to the issue as why Plaintiff's counsel has not gotten the reports directly from Kaleida and Catholic, Mr. Cordello has said that they needed the questions and they needed to establish the authenticity of the Defendant's reports.

Well, first of all, the Defendant's reports are printed by the Defendants and the Defendants can establish the authenticity of their own documents.  To the extent that additional authentication is required we offered in a response to Mr. Cordello's Motion to Compel or I think in this case it was in our Motion to Quash actually, to stipulate to the authenticity of any reports to the extent that the hospital was unable to authenticate them themselves.

So that could have been handled in a very different manner.  To the extent that the Court wants us to or that that the Plaintiff's counsel thinks that as to separate the correction of the documents into two different – – – with the reports being pretty – – – and then these other communications being produced at a later time.

We don't care how it is produced in what order, you know things of that nature, Your Honor, this seems to me to be a way to

slow things down sort of a waste of time.  It seems to me that it could all be done once and done quickly if we could just resolve these other issues.

Finally, with respect to sampling, BIA did not say and I did not agree that sampling is appropriate. I don't think sampling is appropriate, I don't think sampling is required, I think sampling will be a further delay, I think it will increase the expense and I think that it will ultimately lead to exactly the same results.

The sampling time that we are going to have review the samples all to make a determination of whether we are going to use key words or not seems to be an extra step but if the Court orders us to do that then of course that is what we will do.  Thank you, Your Honor.

*Id.* (Tr. 30:20 - 31:16, 32:2 - 34:3).

After listening to the arguments of counsel the Court found ANA to be a third party and not an adversary.  The Court designated BIA to be the e-discovery vendor in this case.  The Court concluded the telephone conference by stating,

I have ordered the ANA to produce information that they do not want to, it is limited to meal breaks, we know if it is going to be [] electronic[ally] produced this is going to [require the services of the e-discovery] vendor, I have already said there is going to be an assignment of cost in the case and those are the principle guidelines.

I am going to step back now and allow the parties to begin working on details.

*Id.* (Tr. 37:10-17).

A subsequent telephone discovery status conference was held on June 27, 2012.  Despite efforts by this Court to assist the ANA and the Plaintiffs to bridge their differences, no agreement could be reached.

<u>**ANALYSIS**</u>

This Court compelled ANA, as a non-party, to produce certain documents to Plaintiffs, over ANA's objections as outlined in its motion to quash subpoenas. Federal Rule of Civil Procedure 45(c)(2)(B)(ii) states that if a non-party objects to the subpoena but a court nonetheless commands a non-party to produce materials, the court's order "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance." Pursuant to this rule, in the Order of January 13, 2012, the Court directed that "the cost for this discovery production will be borne by Plaintiffs[.]" ECF No. 14 ¶ 8. "The relief provided by Rule 45(c)(2)(B) applies when a motion to compel is filed in response to an objection to a subpoena." *Williams v. City of Dallas*, 178 F.R.D. 103, 113 (N.D. Tex. 1998). Such a sequence of events occurred in this case.

The Advisory Committee Notes provide additional insight about the purpose of Rule 45(c)(2)(B)(ii).

> A non-party required to produce documents or materials is protected against significant expense resulting from involuntary assistance to the court. This provision applies, for example, to a non-party required to provide a list of class members. The court is not required to fix the costs in advance of production, although this will often be the most satisfactory accommodation to protect the party seeking discovery from excessive costs. In some instances, it may be preferable to leave uncertain costs to be determined after the materials have been produced, provided that the risk of uncertainty is fully disclosed to the discovering party.

Fed. R. Civ. P. 45 advisory committee's note.

This Court's authority to shift costs to the *Gordon* Plaintiffs derives from Rule 45(c). *See Angel v. Kelly*, 234 F.R.D. 135, 138 (M.D.N.C. 2006) (recognizing "the authority to [fix compensation] derive[s] from the fact that the courts entered an order requiring production pursuant to Rule 45."). Moreover, this is not a case where the ANA voluntarily produced

documents without waiting for a court order.  *See DNT, LLC v. Spring Spectrum, LP*, 750 F. Supp. 2d 616, 626 (E.D. Va. 2010) ("[B]ecause Qualcomm did not wait for this Court, or the Court that issued the subpoenas, to order compliance, it does not have the right to seek reimbursement under Rule 45 for the costs associated with its production."); *Angel,* 234 F.R.D. at 139 ("Because the BTCM Firm did not wait for a court order, its production of the documents does not fall within Rule 45; nor, does it have a right to seek reimbursement post-production based on Rule 45.").

Plaintiffs assert that they should not bear any costs before the Court's May 9, 2012 Order designating BIA as the e-discovery vendor.  *See* ECF No. 39.  Plaintiffs' counsel and their consulting e-discovery expert assert "when a party is required to pay for production, they get to cho[o]se the vendor, they cho[o]se the methodology, they authorize the work, they tell the vendor when to pull the trigger and they monitor the work."  ECF No. 31 (Tr. 16:6-9).  Plaintiffs contend they "are being asked to pay for an e-discovery vendor that [they] had no voice in selecting to conduct searches that [they] have never endorsed."  ECF No. 61 (Tr. 12:22-24).  The Court disagrees.

If Plaintiffs were so concern about controlling costs, if Plaintiffs were so concerned about selecting the e-discovery vendor to conduct searches they endorsed, the Court is perplexed by the abdication by Plaintiffs' counsel for the first three weeks after the Court's oral ruling on January 10, 2012 as memorialized in the Order of January 13, 2012.  Plaintiffs were well aware that the Court had ordered the ANA to produce documents within 45 days.  Nevertheless Plaintiffs' counsel did not inquire of ANA's counsel about the selection of an e-discovery vendor, the methodology to be employed or the searches to be conducted.  It was only on February 3, 2012, after the ANA presented BIA's proposed scope of work and estimated cost overview, did

Plaintiffs object, *for the first time*, about the proposed costs associated with the ordered ANA production.  Plaintiffs therefore must bear all reasonable costs incurred by the ANA between January 13, 2012 and February 3, 2012.

BIA revised the Scope of Work and the Estimated Cost Overview on *six* occasions.   The Court finds these revisions could have been avoided if Plaintiffs' counsel had opened a dialogue with the ANA shortly after the Court's January 2012 ruling to define with particularity what information BIA would be retrieving.  As noted *supra*, after BIA revised the original scope of work, subsequent to the February 28, 2012 telephone conference, Plaintiffs' counsel refined the requested discovery and thereby BIA had to revise again the scope of work.  Further, during the meet and confer on March 15, 2012, Plaintiffs' counsel again modified the scope of electronic information sought.  Once again, BIA had to revise the scope of work.  The reasonable costs of these six revisions shall be borne by Plaintiffs.

Additionally, the Court finds Plaintiffs could have controlled costs by avoiding the lengthy litigation in this district if Plaintiffs' counsel had moved to compel documents from the Defendant hospitals in the underlying cases *before seeking to compel* documents from the ANA.  During the January 10, 2012 motions hearing Ms. Cones provided background information about the reports in the possession of the Defendant hospitals.

> The information, the reports, the hospitals' reports, they're used by the hospitals who elect to participate.  They come to ANA, they pay for this service, for this tool, and they do it for the purpose of making strategic improvements in nursing care, patient outcomes and patient safety.
>
> *        *        *
>
> The hospitals input the data, they order the reports, they select what information they want to have reported, et cetera.  Again, NDNQI just stores the information.   In that sense the hospitals are preparing the reports that meet their needs.   They

select what information they want to get back and it's printed out
and they get their reports, which they pay for.

\*                              \*                              \*

The hospitals do the survey.  The employees take the
survey.  ANA doesn't do it, NDNQI doesn't do it.  We create the
survey tool.  It's taken by the hospitals.

Again, it's just – – NDNQI is a repository to safely house
the data.  The hospitals pay for the surveys that they elect to
participate in.  They can take some, not others, they can take them
all, depends on their needs.  And they order the results and reports
that they need for improving quality patient care.

ECF No. 53 (Tr. 36:20-25, 37:3-9, 39:4-13).

The Court is struck by the protracted litigation in the *Hinterberger* and *Gordon* cases

compared to the smooth pace of production and subsequent deposition of an ANA Rule 30(b)(6)

deponent in the case of *Camilotes v. Resurrection Health Care Corporation*, AW-11-CV-3021.

The *Camilotes* Plaintiffs are not represented by the counsel and law firm who represent the

*Hinterberger* and *Gordon* Plaintiffs.  During the January 10, 2012 motions hearing, the

*Camilotes* counsel disclosed that the Defendants in the underlying litigation had produced the

documents from the NDNQI survey.  The *Camilotes* Plaintiffs were not seeking additional

production from the ANA with their subpoena.  The *Camilotes* Plaintiffs sought to depose an

ANA representative.  As memorialized in the Order of January 13, 2012, the Court intended for

there to be one global deposition of an ANA representative by Plaintiffs in various cases and

then an individual deposition of an ANA representative (not to exceed three hours) by the

*Camilotes* Plaintiffs.  *See* ECF No. 14 ¶¶ 3-4, 6 (*Camilotes*, AW-11-CV-3021).

On March 8, 2012 the Court modified paragraph 6 of the Order of January 13, 2012

[B]y striking the phrase "global deposition."  Due to ongoing
disputes about the scope of production and costs in the
Hinterberger case (AW-11-CV-2836) and the Gordon case (AW-

11-CV-2837), Plaintiffs in this case may proceed separately from the "related cases." Specifically, Plaintiffs will serve the list of topics on ANA by March 10, 2012. Plaintiffs will depose an ANA designee or designees by April 10, 2012.

ECF No. 16 (*Camilotes*, AW-11-CV-3021).

The Court believes a similar approach by counsel in the *Hinterberger* and *Gordon* cases would have streamlined the process and saved the ANA, Plaintiffs and this Court a considerable amount of time and money.

Further, the Court notes that, at the outset, the ANA informed this Court and counsel for Plaintiffs that the ANA and personnel managing the NDNQI database at KU lacked the resources to review the database and produce the information Plaintiffs requested. Through affidavits the ANA demonstrated how burdensome the task would be on the personnel at the ANA and at KU. The ANA disclosed, in advance, that if compelled by the Court, it would have to retain the services of an outside e-discovery vendor to the conduct the searches of the NDNQI database. The ANA still would need to conduct a privilege review by in-house counsel thereafter.

The Court finds (a) the ANA does not have an interest in the underlying litigation in the case of *Gordon v. Kaleida Health*, (b) the underlying litigation is not of public importance and (c) the ANA, a non-profit, professional organization representing registered nurses, cannot more readily bear the costs of production than the requesting *Gordon* Plaintiffs. *See Georgia-Pacific LLC v. American Int'l Specialty Lines Ins. Co.*, 278 F.R.D. 187, 190 (S.D. Ohio 2010) (identifying "relevant factors for determining how much of the production cost the requesting party must bear"). Although the *Gordon* Plaintiffs shall bear the majority of the costs of production, there are some costs the ANA should absorb.

Regarding the issue of attorney's fees, the ANA may be entitled to a portion of fees claimed if the Court deems the fees reasonable. As listed on its website the "ANA advances the

nursing profession by fostering high standards of nursing practice, promoting the rights of nurses in the workplace, projecting a positive and realistic view of nursing, and by lobbying the Congress and regulatory agencies on health care issues affecting nurses and the public." *ANA*, http://www.nursingworld.org/FunctionalMenuCategories/AboutANA (last visited Feb. 7, 2013). The ANA as a non-profit, professional organization has undoubtedly received third-party subpoenas in the past. Such subpoenas are a cost of doing business in today's society. Therefore these fees will not be borne exclusively by the *Gordon* Plaintiffs.

Having affirmed the general parameters that the *Gordon* Plaintiffs bear the reasonable costs of production and this Court's authority to do so pursuant to Rule 45(c)(2)(B), the Court hereby **directs** the ANA to file a motion for an award of costs and fees within thirty (30) days. Any response in opposition must be filed by the *Gordon* Plaintiffs seventeen (17) days thereafter. If the ANA so desires, it may file a reply seventeen (17) days after the filing of the *Gordon* Plaintiffs' opposition.

February 13, 2013                    _____/s/_____
        Date                            WILLIAM CONNELLY
                                     UNITED STATES MAGISTRATE JUDGE